NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                         :

HERMAN GOMEZ,                   :           Civil Action No.: 06-5352

                                          :

        Plaintiff,          :

                                          :

        v.                    :           **OPINION**

                                          :

CON-WAY CENTRAL EXPRESS    :

INC., ET AL.,                 :

                                          :

        Defendants.       :

_____:

**SHERIDAN,  U.S.D.J.**

      This matter comes before the Court on Defendant's, Con-Way Freight, Inc. (Con-way), [1]

motion for summary judgment to dismiss claims brought by its former employee, Plaintiff,

Herman Gomez.  Mr. Gomez seeks damages on two claims – the New Jersey Law Against

Discrimination (N.J.S.A. 10:5-4.1, *et seq.*) (NJLAD) and the New Jersey Workers Compensation

Act (N.J.S.A. 34:15-39.1, *et seq.*) (Workers Compensation Act).

      As per his first claim, when an employee, such as Mr. Gomez, becomes disabled, the

NJLAD requires an interactive process between employer and employee so that an attempt is

made to reasonably accommodate the employee's disability.  Both parties are required to

participate in good faith.  Here, Mr. Gomez argues that Con-way did not participate in the

interactive process in good faith.  After reviewing the evidence, this Court agrees with Plaintiff

---

[1]    Plaintiff's complaint brought this action against Con-Way Central Express, Inc.
and Con-Way Transportation Services, Inc.  Defendant's Answer explains that this denomination
is incorrect and that Defendant is one entity, Con-Way Freight, Inc.  The Court will refer to one
Defendant (Con-way) throughout this opinion.

and finds that a reasonable juror could find that Con-way violated the NJLAD.  Defendant's motion for Summary judgment is denied with regard to Plaintiff's first claim.  To succeed on his Workers Compensation Act claim, Plaintiff must show a causal nexus between his filing for workers compensation and adverse employment actions (dismissed) by Con-way.  This Court finds that no reasonable juror could find such a connection and thus grants Defendant's motion for summary judgment with regard to this claim.  Accordingly, summary judgment is granted in part and denied in part.

## I.

Plaintiff originally filed his complaint on October 4, 2006 in New Jersey Superior Court. Defendant removed to this Court on November 8, 2006 based on diversity of citizenship and an amount in controversy exceeding $75,000 pursuant to 28 U.S.C. § 1332.  Plaintiff is a resident of New Jersey.   Defendant is a trucking company incorporated under the laws of Delaware with its principal place of business in Michigan.

Con-way hired Mr. Gomez in August 2004 as a Driver Sales Representative (DSR).  He had received his commercial driver's license nine months earlier, and this was his first truck driving job.  His duties included loading and unloading freight on and off truck trailers and making deliveries and pick-ups that required frequent lifting and carrying of heavy freight.  Mr. Gomez estimates that prior to his injury, from August 2004 to about January 2005, he spent nearly all of his time loading and unloading freight at Con-way's terminal in Carlstadt, New Jersey.  The DSR job is physically demanding; according to Con-way's job description, the freight lifted and carried by a DSR is frequently up to 50 pounds and occasionally greater than 76 pounds.  Con-way has more than 20,000 employees, a majority of whom are DSRs.

Mr. Gomez had a history of back injury prior to working at Con-way.  He testified that he

originally injured his back in 1998; however, Defendant contends that Mr. Gomez has been suffering back pain since 1992.  Beginning in late 2004, Mr. Gomez felt pain in his lower back that gradually worsened, causing him to walk with a limp.  At deposition, Mr. Gomez admitted that this pain was similar to the lower back and leg pain he experienced in 1998.  He further testified that this pain was not the result of a particular injury he could recall but was rather a "gradual thing" that seemed to get worse.

On January 13, 2005, Mr. Gomez sustained rehabilitating injuries to his back in the course of his employment.  As a result, he consulted his doctor.  On January 30, 2005 his physician at Holy Name Hospital in Teaneck, New Jersey found that Plaintiff suffered a "disc extrusion."  The physician submitted to Con-way a note dated February 7, 2005 that directed that Plaintiff be restricted from lifting more than five pounds until further notice.  The recommendation stated in full, "Avoid prolonged standing.  No lifting > 5 lbs until further notice."  Immediately thereafter, due to Plaintiff's lifting restrictions, Con-way placed Mr. Gomez on light duty (painting, sweeping, and moving boxes) at a rate of pay about two-thirds of his previous pay.

On February 10, 2005, Dr. Eugene Fulop, a company physician for Con-way, examined Plaintiff and completed a report indicating that Mr. Gomez was restricted from lifting more than 25 pounds.  On this same date, Kevin Doyle, Con-way Service Center Manager at the Carlstadt facility, prepared a report stating that Mr. Gomez's injury was to his lower back and that whether the injury was work related was "suspect."  Then on or about March 17, 2005, Mr. Gomez suffered another back injury when a trailer in which he was working suddenly jolted back and forth causing him to lose balance and fall to the floor.  The record contains two medical reports

3

from Dr. Fulop dated shortly after this injury.  Dr. Fulop examined Plaintiff on March 17, 2005 and recommended that Plaintiff return to work with no repetitive lifting over 25 pounds.  On March 24, 2005, Dr. Fulop again examined Mr. Gomez and again reported that Plaintiff may return to work with a 25-pound lifting restriction.  It is not clear whether Mr. Gomez ever saw a company doctor again.  Mr. Gomez testified that at this time, his personal physician still recommended a five-pound lifting restriction.

On May 10, 2005, attorney Alan Krumholz, on behalf of Plaintiff, wrote a letter to Con-way advising Defendant that he represented Mr. Gomez.  Mr. Krumholz further asserted that the reduction in Mr. Gomez's pay constituted a violation of the ADA and the NJLAD, and that there was evidence of retaliation in violation of the Workers Compensation Act.  Finally, the letter insisted that Con-way return Plaintiff to his former pay rate and demanded attorney's fees.  Mr. Krumholz then threatened legal action if Con-way did not respond to these demands within a reasonable time.

On or about June 13, 2005, Plaintiff sent a letter to Con-way inquiring with whom he could speak about accommodating his temporary disability at work.  In the following week, three telephone conference calls were held among Plaintiff, Mr. Doyle, Michael Leathers, Con-way Director of Human Resources, and Sharon McCurdy, Con-way Human Resources Assistant. These calls were apparently in response to Plaintiff's June 13, 2005 letter; however, Mr. Gomez recalls that the calls centered on whether his back condition was a disability under the ADA.[2]  By

---

[2]      Pursuant to 42 U.S.C. § 120102(1), "disability" with respect to an individual means: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."

contrast, Defendant recalls that the issues discussed were the nature of Plaintiff's condition and his inability to perform the essential job functions of the DSR.

On June 24, 2005, Mr. Gomez spoke by telephone with Con-way President, David Miller. During this conversation, Plaintiff advised Mr. Miller that Mr. Leathers had told him that Con-way did not consider him disabled and that it would not make accommodations for him.  Con-way denies that it would not make accommodations.  A letter from Mr. Leathers dated June 28, 2005 informed Plaintiff that after conducting a full investigation, Con-way did not feel that Plaintiff's injury fell under the ADA's definition of "disability."  The letter emphasizes that Mr. Gomez had expressed that the injury was temporary in nature and did not affect a life function. Plaintiff takes issue with the background and the experience of Mr. Leathers to render such a judgment without a medical background.  For example, Plaintiff argues that Mr. Leathers had no training with "medical terms" and coloqually described a "herniated disc" as merely a "back injury."  Further, Mr. Leathers testified that he did not speak with any medical doctors before issuing the June 28, 2005 letter.

By letter dated June 24, 2005, Mr. Krumholz wrote to Con-way requesting that Plaintiff return to his former DSR job at his previous rate of pay, so long as an accommodation was made. According to Plaintiff he would need an accommodation to perform approximately 5% of his duties.  Scott Engers, Con-way Deputy General Counsel, responded to Mr. Krumholz, by letter dated July 21, 2005, explaining that due to Mr. Gomez's 25-pound lifting restriction, he could not perform the essential functions of a DSR, which required frequent lifting of objects greater than 25 pounds.  Further, Mr. Engers rejected Mr. Gomez's request for an accommodation that would allow him to work as a DSR as overly burdensome on the company and stated that Con-

way could not identify any way that Plaintiff, due to his lifting restriction, could perform the essential functions of a DSR. The letter was clear that Con-way believed that for Mr. Gomez to work as a DSR would require accommodation for far more than only 5% of his duties. Mr. Engers additionally noted that Con-way was open to other suggestions that would allow Mr. Gomez to return to work. Finally, Mr. Engers asked, "Can you confirm that [Mr. Gomez's] restrictions are temporary and when he can be expected to be released?"

As part of Plaintiff's employment at Con-way, he had been scheduled to attend a new employee orientation/training program in Michigan in June-July 2005. However, on June 29, 2005, Con-way precluded Plaintiff from attending the orientation pursuant to a company policy that it did not allow workers on light duty to attend this program.[3] The employee training was not limited to DSRs but included employee training for other positions, such as customer service and sales positions.[4] Other types of training, such as focus training and management training, are also held at the Michigan training facility.

A fax dated June 30, 2005 from Mr. Gomez to Jennifer Pilegg, Con-way Senior Vice President and General Counsel, complained that Mr. Leathers was motivated by discriminatory intent when he denied Mr. Gomez from receiving training and orientation. Plaintiff alleged that Mr. Leather's actions were motivated, in part, by Plaintiff's filing a workers compensation claim.

In a fax dated July 8, 2005 from Mr. Gomez to Douglas Stotlar, the CEO of Con-way, Mr. Gomez argued that he had a disability under the ADA and NJLAD.[5] A fax dated July 29,

---

[3]     Plaintiff contends that he would have learned additional skills during the training program that may have aided him in finding a position that did not require lifting.

[4]     Plaintiff may have wished to be reassigned to positions such as these.

[5]     The fax appears to be missing three of its five pages.

2005 from Mr. Gomez to Mr. Stotlar stated that if Con-way refused an accommodation because it was an undue burden, it must be able to demonstrate proof.

In early August 2005, Plaintiff engaged in several phone calls with Mr. Leathers in which Plaintiff "request[ed] accommodations for disability." These requests included "personal assistance on an as-needed basis" and "job restructuring." According to Plaintiff, the tone of these discussions was "heated."

Mr. Gomez's light duty period ended on or about September 28, 2005, after which he applied for and was granted a leave of absence. At some point while Plaintiff was on light duty, Mr. Leathers retained Roy Hirschfeld, a vocational rehabilitation specialist to evaluate whether Plaintiff could perform the job of DSR given his medical condition.[6]

Plaintiff arranged a meeting with Mr. Hirschfeld on an August 17, 2005 call. Before meeting with Plaintiff, Mr. Hirschfeld issued a report, dated September 20, 2005, that concluded that there was no reasonable accommodation Con-way could have provided for Mr. Gomez to work as a DSR. In December 2005, Mr. Gomez met with Mr. Hirschfeld. Soon after, Mr. Hirschfeld issued a "Vocational Report," dated December 21, 2005, which sought to determine if there were any reasonable and safe accommodations to the essential job functions of DSR that could allow Plaintiff to work as a DSR given his physical limitations. The report noted that Mr.

---

[6] No one at Con-way asked Mr. Hirschfeld to consider any other positions within Con-way for which Plaintiff may have been qualified. Mr. Hirschfeld testified that he met with Mr. Doyle and asked him whether there was a suitable alternative employment option for Mr. Gomez. Mr. Doyle responded that Plaintiff had the opportunity to apply for other jobs within Con-way that he was capable of performing if they were available. Mr. Hirschfeld further testified that he was not provided with any medical records for Plaintiff, although he had asked Mr. Gomez for such records.

Gomez was defensive and reluctant to clarify his current treatment.  It also notes that Mr. Gomez clarified his 25-pound lifting restriction as a permanent restriction.  As in the September 2005 report, this report also concluded that due to Mr. Gomez's condition, there was "no reasonable modification on a permanent basis that can be provided for [the DSR] position."  Mr. Hirschfeld wrote Plaintiff stating that he believed that Con-way had made a clear effort to provide a temporary accommodation, and indicated that Con-way could not retain Plaintiff for a prolonged period.  The report recommends that Con-way conduct a functional capacity evaluation to ensure that there was clear documentation of the restrictions and capacities for the physical requirements of the DSR job; however, Con-way never performed this evaluation on the basis that Mr. Gomez could not lift more than 25 pounds, he could not perform the essential functions of a DSR and thus, further evaluation was not necessary.  Later, in a December 6, 2006 letter, Plaintiff informed Con-way that he made proposals to Mr. Hirschfeld regarding accommodations but did not get a response from either Mr. Hirschfeld or Con-way.

A letter from Plaintiff dated June 2, 2006 is the first time in the record that either party broaches Mr. Gomez's working at a different job than DSR within Con-way.  In this letter, Mr. Krumholz expressed that his client was capable of working in Quality Assurance, but Con-way had refused permission for him to apply.  The Quality Assurance job does not require any lifting; however, it purportedly requires trucking experience, and Mr. Gomez's trucking experience was limited to his brief time with Con-way.  However, Mr. Gomez also testified that a colleague had worked in Quality Assurance yet had less experience than Mr. Gomez did.  Plaintiff also testified that Con-way's Rick LaRosa, a personnel supervisor, had refused to let him apply for this position.  Mr. LaRosa's reason was that when Plaintiff sought to apply, he was on light duty, not

full duty.

In this letter, Mr. Krumholz also wrote that Mr. Gomez only needed assistance lifting objects over 40 pounds and that he was qualified to return to his job as a DSR. At deposition, Mr. Gomez clarified that at this time, his lifting restriction remained at 25 pounds and that the "40 pounds" was in error; however, Con-way's numerous letters to Plaintiff make clear that it did not know what Plaintiff's lifting restrictions were since he did not provide updated medical information since shortly after his injuries. The letter also requested a copy of the recommendations made by Mr. Hirschfeld. The letter closed by opining that if Con-way failed to make reasonable accommodations, Mr. Kumholz was prepared to sue Con-way under the NJLAD.

Con-way responded to the June 2, 2006 letter in a July 5, 2006 communication from Mr. Engers to Mr. Krumholz that explained that it felt that it was unsafe to allow Mr. Gomez to work as a DSR. The letter specifically asked for a release from a medical provider confirming Mr. Gomez's current weight restrictions.

A short letter dated September 13, 2006 from Mr. Gomez to Mr. Engers inquired, "What are the non-essential functions of the job duties of a Driver/Sales Rep. (DSR)?" A letter from Mr. Engers to Mr. Krumholz, dated September 26, 2006, responded that Con-way had already sent Plaintiff a description of the job's physical requirements. The letter also asked for updated medical information. The letter was clear that Con-way had no current medical report justifying Mr. Gomez's leave of absence even though it had previously asked for confirmation twice. The letter further stated that Con-way had called Mr. Gomez to ascertain his current medical status but that he had refused to talk to Con-way and said that his attorney would contact the company.

9

On October 4, 2006, Plaintiff filed this suit in New Jersey Superior Court.

In a letter dated December 6, 2006 from Mr. Gomez to Con-way's Human Resources Department, he wrote, "Status of my leave/medical the same."  He apologized for not informing Con-way of this fact sooner, explaining that he could not afford medical treatment and that this was his first experience dealing with anything like this injury.  Plaintiff also requested an extension of his leave of absence past March 28, 2007.

Greg Pawelski, Con-way Director of Human Resources, responded by letter dated December 22, 2006.  The letter once again requested updated medical information—"I cannot stress strongly enough how important it is for you and your attorney to respond to our repeated requests for updated medical information."  Mr. Pawelski also responded that Con-way could not consider an extension of Plaintiff's leave of absence without updated medical information.[7]

By letter dated January 8, 2007,[8] Mr. Gomez wrote to Mr. Pawelski to propose the following accommodations:  reassignment to a different job position or additional accommodations to allow him to work as a DSR.  At his deposition, Plaintiff testified that to the best of his recollection, this letter marked the first time that he requested a job reassignment in writing.  In the letter, Mr. Gomez proposed, "Reassigning me, (a current employee) to a vacant position for which I am qualified, if you believe I am unable to do the original job."  The January

---

[7]     Plaintiff's failure to respond to Con-way's requests for documentation of his medical condition is made clear at Plaintiff's deposition.  At one point, he is asked, "Q:  So, again, at this time, December of 2006, you had either directly to you or through your attorney repeated requests by Con-Way to provide updated medical status; correct?  A:  Yes.  Q:  And neither you nor your attorney ever provided updated medical status; is that correct?  A:  correct."

[8]     A second copy of this letter with a handwritten date of December 6, 2006 is attached as Plaintiff's Exhibit L, whereas the same letter, with the January 8, 2007 date, is attached as Plaintiff's Exhibit K and also as Defendant's Exhibit 34 .

8, 2007 letter further demanded that Con-way produce objective evidence that accommodating Plaintiff was an undue hardship and compared this demand to Con-way's insistence on receiving proof of Mr. Gomez's medical condition.

Although this is the first explicit written request for reassignment, Plaintiff maintains that he had previously made such requests verbally to Mr. Leathers.  Plaintiff accuses Mr. Leathers and Con-way of ignoring him and focusing exclusively on Plaintiff's ability to work as a DSR, and in doing so, not considering the possibility of accommodating him by reassigning him.  Mr. Leathers testified that he did not attempt to find Plaintiff another position within the company, nor did he direct anyone to assist him in finding another position.

Mr. Pawelski responded to Mr. Gomez in a letter dated January 25, 2007 offering to discuss Mr. Gomez's interests in other open positions.  The letter further stated, "We have repeatedly requested . . . clarification and you have failed to provide us with updated medical information or even confirm your lifting restrictions or even advise when you might be able to return to work."  Further, "[I]t is imperative that you provide updated medical information justifying your leave [of absence]."  Mr. Pawelski again wrote to Plaintiff in a January 31, 2007 letter to remind him that his leave of absence was scheduled to terminate on March 28, 2007 and that without updated medical information, Con-way could not consider extending Mr. Gomez's leave.

In a March 20, 2007 letter, Mr. Pawelski wrote to Plaintiff, setting forth its policy of limiting medical leaves of absence to 18 months unless the employee has a reasonable, definitive return to work date.  The letter, as did numerous other letters from Con-way, requested updated medical information, without which Con-way could not evaluate the leave of absence or the

11

ability to return to work.  Plaintiff once again failed to respond, and a letter from Mr. Pawelski to

Mr. Gomez dated March 29, 2007 informed Plaintiff that because Con-way was unable to

conduct a job reassignment because of his failure to provide updated medical information; and

because Con-way's maximum leave of absence was limited to 18 months; and consistent with

Con-way's previous communications, Mr. Gomez was terminated as of March 28, 2007.

       At deposition, Mr. Doyle, Carlstadt Service Center Manager, and Mr. La Rosa, Personnel

Supervisor, responsible for three facilities, including Carlstadt, were asked about jobs that,

presumably, Plaintiff's lifting restriction would not prevent him from doing.  Plaintiff argues that

Con-way's failure to make more of an effort to reassign him to another job evidences

Defendant's bad faith.  Mr. Doyle was not aware that any position other than DSR was ever

offered to Mr. Gomez.  Further, Mr. Doyle could not recall anyone at Con-way asking him

whether there were any vacancies for Mr. Gomez at the Carlstadt facility.  One job ostensibly not

involving lifting was "greeter," and Mr. Doyle testified that there were two greeters at the

Carlstadt facility.  He could not recall whether there were any vacancies in Carlstadt between

2004 and 2006, but Mr. La Rosa said there were vacancies for greeters at this time.  Another such

job was "weight and inspection research analyst."  Mr. Doyle testified that there was one such

job at Carlstadt.  A third job Plaintiff may have been able to perform was "customer service

representative."  Mr. Doyle and Mr. La Rosa testified there were 7-8 of these positions at

Carlstadt; Mr. Doyle recalled that there were vacancies from 2005-06.  Another job was "freight

operations supervisor."  Mr. Doyle testified that there were about eight of these at Carlstadt, and

there were vacancies between 2004 and 2006.  Yet another job was that of "dispatcher;" Mr. La

Rosa testified that the company used only one, and Mr. Doyle could not recall whether there were

any dispatcher vacancies in the office at Carlstadt.

Plaintiff alleges in his second claim that Con-way violated the Workers Compensation Act by discriminating against him for filing such a claim.  The record is thin on facts relating to this allegation.  It is not clear when Mr. Gomez filed his claim.  He recalled at deposition that he began thinking about filing a claim sometime after the injury he suffered on or around March 14-17, 2005.  Mr. Gomez also recalled that when his light duty began, on or around February 7, 2005, he had not yet filed his claim.  However, a Workers' Compensation Statement of Injury form Mr. Gomez prepared dated February 9, 2005 states that he was injured sometime between December 13, 2004 and January 13, 2004, which caused pain in his back and right leg.  The Statement of Injury further provided that Plaintiff had seen his primary care physician to address this injury.  A second Workers' Compensation Statement of Injury form prepared by Mr. Gomez, dated March 17, 2005, reported that he had fallen to the floor and injured his back that day while on light duty.  A third Workers' Compensation Statement of Injury form prepared by Mr. Gomez and dated April 16, 2005 indicates that he had pain in his back and per instructions, was not lifting over 25 pounds.

Mr. Krumholz's first letter to Con-way, dated May 10, 2005, charged, among other things, that he had evidence that Con-way had violated the Workers Compensation Act in its treatment of Plaintiff and threatened legal action if Con-way did not respond to this charge within a reasonable time.  On or about May 26, 2005, the workers compensation insurer denied Mr. Gomez's claim, finding that his condition did not arise out of or in the course of his employment. After the denial, the workers compensation insurer instructed Plaintiff to send any medical bills incurred to his regular insurer; however, Plaintiff testified that his regular insurer refused

coverage.  Finally, a fax dated June 30, 2005 from Mr. Gomez to Ms. Pilegg alleged that Mr. Leathers's refusal to let Plaintiff attend new employee training and orientation in Michigan was motivated, in part, by Plaintiff's filing a workers compensation claim.

II.

A.      *Summary Judgement*

This matter comes up on summary judgment.  Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists.  *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985).  The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial.  *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995).  "[U]nsupported allegations . . . and

14

pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912

F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set

forth specific facts showing that there is a genuine issue for trial").  If a court determines, "after

drawing all inferences in favor of [the non-moving party], and making all credibility

determinations in his favor–that no reasonable jury could find for him, summary judgment is

appropriate." *Alevras v. Tacopina*, 226 Fed. Appx. 222, 227 (3d Cir. 2007).

B.     *Count One: New Jersey Law Against Discrimination*

In Count One, Plaintiff alleges that Defendant violated the NJLAD.  The statute

"prohibit[s] any unlawful discrimination against any person because such person is or has been at

any time disabled or any unlawful employment practice against such person, unless the nature

and extent of the disability reasonably precludes the performance of the particular employment."

Under the NJLAD, it is well accepted that an employer "must make a reasonable accommodation

to the limitations of a handicapped employee or applicant unless the employer can demonstrate

that the accommodation would impose an undue hardship on the operation of its business."

*Soules v. Mt. Holiness Memorial Park*, 808 A.2d 863, 867 (N.J. Super. Ct. App. Div. 2002)

(quoting N.J.A.C. 13:13-2.5(b)(3)).  *See also Thorson v. PSEG Power, LLC*, No. L-6448-03,

2009 WL 47410, at *6 (N.J. Super. Ct. App. Div. Jan. 9, 2009) ("our courts have uniformly held

that an employer is required to reasonably accommodate an employee's handicap").

Plaintiff alleges discrimination under the NJLAD, which "relies on the same analytical

framework as the ADA [(American Disabilities Act) 42 U.S.C. § 12101, *et seq*]."  *Van de Pol v.

Caesars Hotel Casino*, 979 F. Supp, 308, 312 (D.N.J. 1997).  To demonstrate that an employer

failed to participate in the interactive process under the ADA, a disabled employee must show:

15

"1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor v. Phoenexville School Dist.*, 184 F.3d 296, 319-20 (3d Cir. 1999); *Accord Thorson*, 2009 WL 47410, at *7.

It is clear that on summary judgment, Mr. Gomez satisfies the first two prongs.  First, Con-way knew about Plaintiff's alleged disability, as its doctor diagnosed Plaintiff's back injury.  Second, Mr. Gomez requested accommodations--he retained a lawyer soon after his injuries to do so.

What is at issue is the third prong of *Taylor*--whether the employer made a good faith effort to assist the employee in seeking accommodations.  Plaintiff disputes that Con-way provided reasonable accommodation.  In order to make a reasonable accommodation, courts require an "interactive process" once an employer receives notice of an employee's disability.  In this interactive process, both employer and employee must communicate with each other to "identify the precise limitations resulting from the disability and potential reasonable accommodation that could overcome those limitations."  *Jones v. Aluminum Shapes, Inc.*, 772 A.2d 34, 40 (N.J. Sup. Ct. App. Div. 2001) (quotation omitted).  Both employer and employee have obligations in the interactive process.  The Third Circuit has held that "both parties have a duty to assist in the search for appropriate reasonable accommodations and to act in good faith." *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997).  Expanding on this idea of good faith in the interactive process, *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996), a case cited with approval numerous times by the Third Circuit, explained, "A party that

16

obstructs or delays the interactive process is not acting in good faith.  A party that fails to communicate, by way of initiation or response, may also be acting in bad faith."  If the court finds that there is a genuine dispute as to whether an employer interacted with the employee in good faith, granting of summary judgment is not appropriate.  *Thorson*, 2009 WL 47410, at *7 (citing *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 (8th Cir. 1999)).

Con-way contends that Mr. Gomez is responsible for the breakdown in the interactive process.  Con-way explains that it always acted in good faith but was hampered in its efforts to reasonably accommodate Plaintiff by his utter refusal to provide updated medical information. The defendant sets forth substantial evidence to buttress this claim–numerous clear and explicit written requests for updated medical information that Mr. Gomez repeatedly ignored.  When asked to supplement its briefing to address whether assigning blame for the breakdown in the interactive process was a question of fact or of law, Defendant responded that when an employee fails to provide requested medical documentation, he is *per se* responsible for the breakdown, entitling the employer to summary judgment.

However, determining good and bad faith is not so black and white.  "[S]ummary judgment should not ordinarily be granted when the action entails a determination of a state of mind such as bad faith."  *Thorson*, 2009 WL 47410, at *7 (citing *Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.*, 854 A.2d 378, 394 (N.J. 2004)).  Defendant's argument loses sight of the difficulties inherent in definitively concluding that one party was completely blameless during the course of an interactive process that lasted over two years.

Mr. Gomez was first injured in January 2005.  He supplied a note of his injury from his personal physician on February 7, 2005, initiating the interactive process.  Con-way

accommodated Mr. Gomez by immediately placing him on light duty.  Plaintiff then supplied

updated medical reports in February and March 2005.  Con-way first requested medical

information in a letter dated July 21, 2005 by asking Plaintiff to confirm that his lifting restriction

was temporary, a request that Mr. Gomez never satisfied, even though he was employed until

March 2007, and all the while still injured.  His light duty ended in September 2005, after which

he was placed on an unpaid leave of absence.  Con-way contends that it accommodated Plaintiff

by both placing him on light duty and then on a leave of absence.  However, these two

accommodations are not sufficient for this Court to conclude that Con-way acted in good faith

during the entirety of the interactive process.

In March 2005, Con-way had on its hands an employee, hired mainly to lift heavy freight,

with a significant lifting restriction.  Con-way maintains that during nearly all of the interactive

process, it focused on returning Mr. Gomez to his job as a DSR because that was what it felt Mr.

Gomez wanted.  And it seems reasonable, or rather obvious, for Con-way to conclude, as it did in

the July 21, 2005 letter from Mr. Engers, that it could not make a reasonable accommodation to

allow Plaintiff to return to a job lifting heavy objects when he was restricted from lifting heavy

objects.

Having determined that it could not accommodate Plaintiff as a DSR, there is a question

as to whether Con-way needed to do more.  Con-way did not broach reassigning Plaintiff to

another position until January 2007, after Plaintiff had explicitly made such a request.  Con-

way's first mention of reassignment came in a January 25, 2007 letter from Mr. Pawelski, after

the current suit had been filed.  This Court finds that this delay presents a genuine issue of fact to

be properly adjudicated by the factfinder as to whether Con-way acted in good faith.  29 C.F.R. §

1630.2(o)(2)(ii) lists "reassignment to a vacant position" as an example of reasonable accommodation.  Guidelines promulgated by the Equal Employment Opportunity Commission (EEOC), which are used for guidance by the Third Circuit,[9] state that reassignment to a vacant position "must be provided to an employee who, because of a disability, can no longer perform the essential functions of his/her current position, with or without reasonable accommodation, unless the employer can show that it would be an undue hardship."[10]

Con-way places the blame squarely on Plaintiff, not just for refusing to provide updated medical information, but also for waiting until shortly before his termination to request reassignment.  However, on summary judgment, this argument fails.  It is "[t]he employer [that] is in the best position to know which jobs are vacant or will become vacant within a reasonable period of time."  *Id.* at Question No. 28.  The information advantage that an employer possesses in knowing which jobs are available that can accommodate an injured employee are clear.  In *Mengine v. Runyon*, 114 F.3d 415 (3d Cir. 1997), the Third Circuit explained, "In many cases, an employee will not have the ability or resources to identify a vacant position absent participation by the employer."  *Id.* at 420; *Accord Taylor*, 184 F.3d at 316 ("the employee does not have the burden of identifying open positions without the employer's assistance").  Yet it is Plaintiff who has discovered potential job vacancies, and in doing so, has at least put at issue whether Con-way could have accommodated him through reassignment.

For example, Plaintiff mentioned the possibility of working in Quality Assurance in a

_____

[9]        *See, e.g.*, *Taylor*, 184 F.3d at 312 & n.5.
[10]       EEOC, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, effective Oct. 22, 2002, Question No. 24, at http://www.eeoc.gov/policy/docs/accommodation.html#N_77_, last visited Feb. 3, 2009 (EEOC Guidelines).

June 2, 2006 letter to Con-way and testified that he inquired about this job previously but was denied the opportunity to apply because he was on light duty.  Further, Plaintiff inquired about a wide range of jobs which could potentially accommodate him at the depositions of Mr. Doyle and Mr. La Rosa.  Their depositions suggest that during the interactive process, there may have been vacancies at jobs that would have accommodated Mr. Gomez given his lifting restriction. Con-way made almost no effort during the interactive process to determine whether there were vacancies for which Plaintiff was qualified.  These findings enable Plaintiff to satisfy the fourth prong from *Taylor*–a reasonable juror could conclude that Mr. Gomez could have been accommodated but for Con-way's lack of good faith.

The evidence could support the inference that Con-way did not make reasonable efforts to reassign Mr. Gomez.  For example, Mr. Leathers, Mr. La Rosa, and Mr. Doyle all testified that they made no attempts to find alternate jobs for Plaintiff.  More revealing is the evidence surrounding the role of Mr. Hirschfeld, a rehabilitation specialist, whom Con-way hired to evaluate accommodating Mr. Gomez.  Mr. Hirschfeld's assignment seems to have been limited to determining whether an employee with an injured back and a significant lifting restriction could work at a job (DSR) that continuously required him to lift heavy freight.  At his deposition, he testified that he inquired about suitable alternative jobs for Mr. Gomez, yet was told only that Mr. Gomez could apply for such jobs if he wished.  Con-way's failure to consider reassignment, even when asked by a consultant ostensibly retained to attempt to accommodate Plaintiff, could support an inference that Con-way was not acting in good faith.

Compare *Mengine*, *supra*, where the Third Circuit granted summary judgment to an employer who was sued by an employee for disability discrimination under the Rehabilitation

20

Act, a statute that incorporates the ADA's concept of "reasonable accommodation."  One of the plaintiff's contentions was that his employer failed to cooperate in an effort to investigate job descriptions and job vacancies.  The court reviewed the interactive process and found that the employer had acted in good faith, particularly by sending the employee "multiple" job descriptions of vacant positions in an effort to meet his needs.  114 F.3d at 421.  The employer's good faith efforts in *Mengine* clearly differ from those of Con-way in the instant case.

This Court recognizes that the law requires participation by *both* employer and employee in the interactive process.  *See, e.g.*, *Shiring v. Runyon*, 90 F.3d 827, 832 (3d Cir. 1996).  Plaintiff's failure to provide updated medical information to his employer for two years of the interactive process certainly could support an inference of his own bad faith.  That is something that Plaintiff will have to address at trial.  However, at this stage in the litigation, it does not excuse Con-way for waiting until 2007 to discuss reassignment with Mr. Gomez.

Con-way argues that it was excused by Plaintiff's refusal to provide medical updates after March 2005.  But it is not until late 2006 that Con-way explicitly and clearly requests this information.  There is a request as far back as July 21, 2005 in a letter from Mr. Engers, but this asked merely for confirmation that Mr. Gomez's lifting restrictions were temporary; it is not as clear as the requests made by Con-way towards the end of Mr. Gomez's employment.  Most of Defendant's strenuous arguing that Plaintiff refused to respond to its numerous clear requests for updated medical information focuses on requests made over a year and a half into the interactive process, after Plaintiff initiated the litigation at hand.  The EEOC Guidelines are clear: "The duty to provide reasonable accommodation is an ongoing one."  (Question No. 32).  The employer cannot sit idly by, as "[t]he employer has at least some responsibility in determining the

21

necessary accommodation." *Beck*, 75 F.3d at 1135.

This Court thus finds that Plaintiff has met its burden for the third prong from *Taylor* on summary judgment. A reasonable juror could conclude that Con-way did not make a good faith effort to assist Mr. Gomez in seeking accommodations. Con-way argues that it reasonably accommodated Plaintiff by placing him on light duty and then on a leave of absence, all the while focusing on returning him to his DSR job. However, the DSR job primarily involves lifting heavy freight. Mr. Gomez was restricted from lifting heavy freight and would thus have a hard time working as a DSR. Con-way needed to do more to survive summary judgment than focusing almost exclusively on returning Mr. Gomez to work as a DSR.

C.    *Count Two: Workers Compensation Claim*

In his second claim, Mr. Gomez alleges that Con-way violated the Workers Compensation Act by retaliating against him for seeking workers compensation. The Workers Compensation Act provides: "It shall be unlawful for any employer or his duly authorized agent to discharge or in any other manner discriminate against an employee as to his employment because such employee has claimed or attempted to claim workmen's compensation benefits from such employer . . . ." Under the Workers Compensation Act, "[t]o make a prima facie case for a retaliatory discharge an employee must prove: (1) that he made or attempted to make a claim for workers' compensation; and (2) that he was discharged in retaliation for making that claim." *Galante v. Sandoz, Inc.*, 470 A.2d 45, 47 (N.J. Super. Ct. Law Div. 1983). In applying this provision, courts require a causal nexus between the workers compensation claim and the employee's discharge. *See Carter v. AFG Indsts., Inc.*, 782 A.2d 967, 972 (N.J. Super. Ct. Law Div. 2001).

22

Defendant argues there is no such nexus and summary judgment should be granted. Con-way explains that it terminated Mr. Gomez because it limits leaves of absence to 18 months (which Gomez was given) unless an employee has a reasonable, definitive return to work date. To oppose summary judgment, the non-movant must set forth specific facts showing that a genuine issue of material fact exists.  It is well-settled that the non-movant cannot satisfy this duty through speculation or conclusory allegations.  *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999).  *Accord GE Commercial Distrib. Finance Corp. v. Great Cove Marina, Inc.*, No. 05-cv-4661, 2008 WL 4513607, at *1 (D.N.J. Sept. 30, 2008) ("the non-moving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment").  In addressing an attempt to defeat a workers compensation claim by summary judgment, a district court observed, "Speculative allegations are insufficient to establish a causal connection between an employee's claim for worker compensation benefits and his termination."  *Griesbaum v. Aventis Pharmaceuticals*, No. 04-cv-1726, 2006 WL 2796160, at *5 (M.D. Pa. Sept. 25, 2006).

Plaintiff theorizes that Con-way violated the Workers Compensation Act by (1) conspiring in the workers compensation insurer's denial of compensation and treatment of his injuries, (2) placing him on light duty and paying him at a reduced rate, (3) failing to permit him to attend new employee training in Michigan, and (4) terminating his employment.  However, Plaintiff sets forth no facts that could create a genuine issue as to whether Con-way discriminated against Mr. Gomez because of his workers compensation claim.

Previously all the correspondence and oral communications between the parties were discussed.  Nowhere is there any document or remark by Con-way showing that it was acting

against Mr. Gomez for filing a workers compensation claim.  Plaintiff sets forth no facts whatsoever suggesting that Con-way conspired in the denial of his workers compensation claim. All Mr. Gomez offers is speculation, but there are no solid facts to support his contention.  The workers compensation insurer denied Mr. Gomez's claims based upon a finding that his condition did not arise out of or in the course of his employment.  This Court infers, based on the evidence, that the decision could have been based on Mr. Gomez's pre-employment history of back injury.  This Court can find no evidence from which to infer that the denial was based upon Plaintiff's filing a workers compensation claim.

Plaintiff next contends that Con-way's designating him to light duty is evidence of a violation of the Workers Compensation Act.  This is incredulous.  The plaintiff submitted to his employer a doctor's note stating that he could not lift more than five pounds.  As a DSR, Mr. Gomez spent about 99% of his time lifting freight that frequently weighed up to 50 pounds and occasionally weighed greater than 76 pounds.  However, instead of laying off Mr. Gomez, on the same day he submitted his note, Defendant allowed him to continue less demanding work at a pay reduced by one-third.[11]  This sounds more like a reasonable accommodation than retaliation.

Plaintiff also argues that Con-way's preventing him from attending new employee orientation in Michigan in June-July 2005 evidences his employer's retaliation against him for filing a workers compensation claim.  Con-way explains that its refusal to allow Mr. Gomez to attend was based on a company policy that barred all workers on light duty from attending this training.  There is no evidence that this exclusion from employee orientation was retaliation for

---

[11]     Employers may provide a lower paying position that reasonably accommodates an injured employee.  *See Jones v. Aluminum Shapes, Inc.*, 772 A.2d 34, 43-44 (N.J. Super. Ct. App. Div. 2001).

filing a workers compensation claim.  Mr. Gomez does not offer a shred of evidence that hints at a factual nexus between the filing of his claim and the inability to attend new employee training. Again, speculation is not sufficient to overcome summary judgment.

Finally, Mr. Gomez maintains that he was terminated, in part, for filing a workers compensation claim.  The communications between Mr. Gomez and Con-way do not support the proposition that his filing a workers compensation claim was the reason he was discharged. Con-way clearly articulated its policy to Mr. Gomez that leaves of absence were limited to 18 months unless an employee had a reasonable, definitive return to work date.  Defendant provided numerous explicit notices that in order to consider extending Plaintiff's leave of absence beyond March 28, 2007, Mr. Gomez needed to provide updated medical information, which he failed to do after March 2005.  Plaintiff, again, offers only speculation to rebut Defendant's evidence.

In *Landmesser v. United Airlines, Inc.*, 102 F. Supp. 2d 273 (E.D. Pa. 2000), the court made a similar finding.  Here, the plaintiff claimed retaliation based on speculation, such as an allegation that everyone engaged in the same sort of behavior for which only she was terminated and the plaintiff's deposition testimony that co-workers complained about having to accommodate her physical disability.  This evidence is more indicative of discrimination against the plaintiff due to her disability.  It does not advance her workers compensation claim.  The *Landmesser* court concluded, "[P]laintiff has advanced only speculation as to the nexus between her [filing for workers compensation] and the discharge, and I concluded that no reasonable jury could find a causal connection based on such speculation."  *Id.* at 278.  In *Landmesser*, as in the case at hand, the plaintiff "conflates a claim for discharge due to disability with a claim for discharge in response to her prior application for workers' compensation."  *Id.*

25

III.

For these reasons, Defendant's motion for summary judgment (Docket No. 12) is granted in part and denied in part.  Plaintiff's first claim, that he was discriminated against under the NJLAD, can proceed, while Plaintiff's second claim, that Defendant violated the Workers Compensation Act, is dismissed.


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

March 18, 2009

26